```
              UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF WEST VIRGINIA
                      AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                              CRIMINAL ACTION NO. 2:12-00049

**NICKEY DON SMITH, II**


MEMORANDUM OPINION AND ORDER

By order of June 11, 2013, the court found the defendant competent to stand trial in keeping with Dr. Clayman's report of April 29, 2013. The late Dr. Krieg (Report March 28, 2012), who had found him not competent to stand trial, concluded that his competency had been restored and agreed with that finding when testifying in this case on June 24, 2013. Dr. Saar (Original Report November 20, 2012) acknowledges the finding of competency as set forth in his Second Report of October 9, 2014. All three are psychologists.[1]

---

[1] Dr. Krieg's report was prepared at the request of defendant's counsel in this, the federal case. The reports of Dr. Saar and Dr. Clayman were prepared for the state case in which defendant is charged with malicious wounding and prohibited felon in possession of a firearm. Dr. Krieg considers both circumstances in this case.

Criminal responsibility is addressed in Dr. Krieg's report as well as his testimony.  It is also addressed in Dr. Saar's second report and Dr. Clayman's report.  Both Drs. Krieg and Saar diagnose defendant as Delusional Disorder, Persecutory Type.  Dr. Clayman diagnoses defendant not as one with delusional disorder, but rather as Personality Disorder NOS with paranoid, narcissistic and anti-social features.

I.

The court makes the following findings of fact by a preponderance of the evidence and its conclusions of law.

The court observes that all three psychologists take note of defendant's version of what may be referred to as imagined beliefs that include his assertion that three guys were out to get him during the period from March 2011 to the time of his shooting an out-of-uniform police officer on December 13, 2011, and for a limited time thereafter while first in jail. During that same period defendant claims to have seen threatening messages, written on walls or items in his trailer home, that were not visible to others, and to hearing muffled voices on occasion that left him fearful for his safety.  During

2

that period the defendant called 911 or the local Glasgow Police Department or other law enforcement agencies nine times to report a break-in or a disturbance or damage to his home.

Not included in the four reports noted above are many of the significant details of that which took place in the span of some twenty minutes beginning at 7:00 p.m. and ending with the defendant's arrest on December 13, 2011.  As will be seen, the defendant is there shown to be in frequent command of his faculties in the course of making false denials and secreting incriminating evidence in what is deemed to be a rational effort to protect himself from criminal liability.

II.

The day before the shooting, A. J. Roop of the Glasgow Police Department came by the defendant's home to inquire of him about a missing cell phone thought to be in defendant's possession.  Without pressing defendant at the moment, Officer Roop told the defendant that he would be back the next day to pick it up after he came back on shift at 5:00 or 6:00 p.m.  On the next day, the defendant and his girlfriend had returned to his home in the early evening after dining.  The defendant said

3

he suspected that some unknown person was then in his home and thought that his girlfriend was conspiring against him. She promptly left at his request made just as he was contacting the Metro 911 dispatcher.

Shortly after 7:00 p.m., the defendant made that call to 911 to report that he had an intruder in his house at 208 Glassfire Lane in Glasgow, West Virginia, and that he needed someone there then. At times he refers to intruders, but then states he is aware of just one. He describes the intruder as a white male whom he did not recognize and also describes the clothing said to be worn by the intruder. When asked whether the defendant was armed with any weapons he answered, "No." After that exchange the 911 dispatcher tells him that "Everybody is getting started, just stay on the line until they get there." With that, at what is said to be approximately 7:08 p.m., the defendant disconnected and did not answer the phone when the 911 dispatcher attempted to call him back.

Officer Roop, who had come back on duty at about 5:00 p.m. and was in uniform dress, responded to the call along with Officer Steve Smith who was off duty and in plain clothes, but at the station. They left in a marked white colored Glasgow

4

police cruiser parked nearby and drove to Glassfire Lane which is in close proximity to the station.  After inquiry of an individual on the street, they were directed to number 208 which was nearby.  They split from each other so that they could check the trailer home for open doors or windows, each taking a separate side of the narrow trailer, the length of which extended in perpendicular fashion back from the street.  Each returned by retracing his path and met at the small elevated porch, located at the front door and reached by about six stair steps located to the right of the porch.  Officer Smith twice yelled out, "Police Department."  The open porch was illuminated by a single bulb immediately to the left and aligned with the top of the screen door.  That door opened from the left, as one faces the door.  Officer Smith moved up the stairs to the porch with his right hand on his weapon that was pointed down his right side.  Just as he reached the porch, with Officer Roop at the bottom of the steps, the barrel of a gun was thrust from inside the house through the screen door.  As Officer Smith raised his weapon to shield himself, he was shot with a single bullet.  He tumbled to the ground.  At that point Officer Roop fired twelve shots into the trailer.

5

Officer Roop then assisted Officer Smith up off of the ground and to their parked cruiser that was located on Glassfire Lane and visible from the west end of the trailer which fronted on the Lane.  At around 7:11 p.m. Officer Roop called 911 to alert them that an officer was down and to "send the world."  Officer Roop observed that the barrel of a gun was sticking out the trailer's west end, which is closest to the street, through a glass window.  The officer then fired another five or six rounds into the trailer.

At approximately 7:13 p.m., the defendant called 911 a second time saying, "I got cops, there's a shoot out at my house."  Then the defendant says, "Tell them I am inside the house.  I am the one being shot at."  When asked his name, the defendant responded, "Nickey Smith.  I am on the end of the trailer.  I am unarmed."  The defendant then repeats by saying, "Tell them I am unarmed.  I'm scared to death."  He then stated, "Get the state police out here with me please.  I don't trust Glasgow Police Department," thereby indicating that the "cops" to which he referred were Glasgow police.  He also said that he had been shot in the hand.  Later on in the conversation the defendant once again says, "I am unarmed.  I don't have anything

6

on me, nothing. A pack of cigarettes, that's it." As with his earlier 911 conversation, the defendant, who was told not to hang up, nevertheless did so.

At about 7:16 p.m. Kanawha County Sheriff deputies and the West Virginia State Police arrived on the scene. A perimeter was formed around the residence. The officers yelled at the defendant to exit the residence following which the defendant yelled back, "I am unarmed, and I am coming out. Do not shoot. I am not the shooter."

The defendant exited his residence with his hands up and was detained in handcuffs. He stated repeatedly to West Virginia State Trooper Comer that he was not the shooter, that he had been shot in the hand, and that the shooter might still be inside. Trooper Comer did not observe any gunshot wounds to the hand of the defendant who did have a small laceration in the webbing of his hand between his thumb and forefinger, which the agents believed was consistent with the action of a shotgun firing. He had no other injuries. The defendant emitted an overwhelming odor of bleach coming from his clothes and body, but professed he did not know why. For scene safety purposes the defendant, after having been advised of his Miranda rights,

7

was asked if anyone else was in the residence.  Defendant again stated he was not the shooter, that he saw a man with a shotgun and did not know where he was, and that an unknown suspect was in his home and had shot at him.

The SWAT team entered the residence, found no other suspects within it, and left after securing the premises.  Later that evening, a search warrant was executed at the trailer home.  There was found a sawed-off shotgun that had been stuffed between a waterbed mattress and the bed frame in a bedroom at the west end of the trailer from which the defendant had poked a weapon through the glass window.  The weapon was identified as a Central Arms Company 12 gauge single-shot shotgun, with the single fired Remington 12 gauge shotgun shell within it.  Blood was located on the weapon near the hand assembly which is deemed consistent with the web of the hand being caught or jarred by the action of that weapon as it fired.

Among the many items also found was an opened bottle of Clorox bleach with the top lying near it.  Also found were a brown colored shirt with a suspected blood stain located behind a television in the bedroom, and a white colored towel with a suspected blood stain located on the floor near the front

entrance.  Ammunition, found in the west bedroom, included one 12 gauge Remington buck shot shell, one 12 gauge Winchester buck shot, and two Remington Express 12 gauge shotgun shells.  On the porch of the residence was found a fired plastic shot gun shell wad that was later determined to be consistent with the 12 gauge Remington shell located in the shotgun.

At the Quincy police detachment, the defendant continued to indicate that he was not the shooter, saying that an unknown person had come through the floor in his bathroom.  The defendant requested to take a polygraph examination.  After being given an explanation of the polygraph procedures and a pre-test interview, the defendant initially denied being the person who shot Officer Smith, but then soon confessed that he shot an individual on his porch, saying that he thought he had shot a burglar, not knowing the person shot to be a police officer.  The defendant, of course, had made the 911 call to express his fear of an intruder inside the house, not a burglar who was attempting to gain entry.

III.

Dr. Krieg, near the conclusion of his report at page 18 states:

> It is obvious that Mr. Smith knew that he should not be in possession of a firearm. On the other hand, it is also obvious that he thought he was under attack. He is able to understand the nature and quality of his criminal behavior, but he believed that he was acting in self-defense. He is of Average intellectual potential but is suffering from a significant mental illness (Delusional Disorder, persecutory delusion (sic), 297.1). This illness does not render him unable to understand the rightfulness or wrongfulness of his behavior but it does affect his ability to reason rationally.

In summary, Dr. Krieg at page 20 of his report states the question asked of him and his answer as follows:

> 2. Did Mr. Smith suffer from a mental illness during the time of the offense, which would impair his judgment and prevent him from appreciating the wrongfulness of his conduct?
>
> Mr. Smith was clearly suffering from a Delusional Disorder, Persecutory Type that impaired his judgment. It made him believe that he was operating in self-defense. He acknowledges that being a convicted felon and having a gun was against the law but he was so frightened by the events of the last eight months, with numerous cries for help that went unanswered, that he felt that he had no choice but to defend himself and take the risk of being convicted of being a felon in possession of a firearm.

10

Dr. Saar in his original report did not express an opinion on anything other than the defendant's competency to stand trial.  In his second report nearly two years later, Dr. Saar references the same materials that he used in his first report.  Absent is any reference to the report of Dr. Clayman or the extensive testimony in this case of Dr. Krieg and other witnesses, including Officer Smith.  His second report is a verbatim restatement of that which is in his first report except that on page 12 he substitutes Criminal Responsibility for Competency to Stand Trial.  No additional research appears to have been done.  He concludes:

> In summary, it is my opinion within a reasonable degree of psychological certainty that Mr. Smith suffered from a mental disease or defect (Delusional Disorder-Persecutory Type), that did impair his reasoning on the day in question; that, with respect to the acts with which he is charged, he did not know the nature and the quality of them, nor did he know the wrongfulness of them, nor did he have the ability to refrain from doing them.

Dr. Clayman's report, unlike the reports of Dr. Krieg and Dr. Saar, includes not only references to the limited materials relied upon by them but also twenty-four separate statements of individuals aware of the defendant's nature, personality, behavior, drug abuse, and some of the facts of this

11

case. In addition, Dr. Clayman made reference to the West Virginia Division of Corrections records compiled while the defendant was incarcerated in the years 2004 and 2005 for an offense of malicious wounding. Those records gave him a benchmark from which to evaluate the defendant and from which he was persuaded that the defendant appeared to be psychologically intact through his discharge from custody in 2005. Unlike Dr. Krieg who proffered that the defendant has been "suffering from this illness since adolescence," which Dr. Krieg in turn connected with the defendant's long history of criminal activities, Dr. Clayman concludes that there was nothing to suggest that the defendant experienced distortions of thought or perception prior to 2005. Dr. Clayman noted as well that the defendant complied with the commands of the police immediately following the shooting, thereby reflecting no evidence of psychosis or delusional thought. Dr. Clayman concludes as follows:

> With regard to his mental state at the time of the alleged crime, Mr. Smith readily admits that he was in possession of the firearm illegally. He claimed altered mental state that included reported numerous calls to the police about people breaking into his home does suggest some distortion of thoughts that could have an impact on his mental state with regard to the shooting of the police officer. However, Mr. Smith has acknowledged his willingness to enter into a

12

> Kennedy-Fraser plea which would preclude his discussing the events. Because questions remain about his actual mental state at the time of the crime, no definitive statement can be made with regard to his ability to distinguish right from wrong; although, there is little doubt that he had the capacity to conform his actions in accordance with the law, if he had so chosen.

## IV.

In considering the varying views expressed by the three psychologists and the limited scope of the records and materials reviewed by Drs. Krieg and Saar as compared to Dr. Clayman, the diagnosis of Dr. Clayman is the more persuasive one being that of Personality Disorder NOS with paranoid, narcissistic and anti-social features, and it is the one the court adopts. It is apparent that the defendant knew what he was doing from time to time during the unfortunate events of December 13, 2011. His response to questions asked of him by the 911 dispatcher in both calls included what may be appropriately inferred as a stream of knowing falsehoods which continued with his initial denials that he was not the shooter, but that the shooter had shot him. Those responses and his actions are readily perceived as a rational effort to shield himself from criminal responsibility.

At 7:00 p.m. the defendant chose to call 911 as if frantically seeking emergency police help at his home with respect to an intruder. He was already aware that Officer Roop would be visiting him that evening to retrieve a cell phone to which the officer must have thought the defendant was not entitled. Once his 911 call was made, knowing that he lived near the police station in the tiny town of Glasgow, he would expect the police to be there in a few minutes. They were. Officer Smith yelled out "Police Department" twice in a manner that should have been sufficient for someone living inside a relatively small trailer home to hear. Instead of welcoming them as the immediate answer to his request for help, the defendant shot Officer Smith and then retreated in a low crawl to the west end of his trailer as Officer Roop unleashed a fusillade of bullets. He was familiar with both Officer Roop, whom he had encountered the day before, and Officer Smith whom he knew from a week prior. When they quickly arrived at his front porch, one in plain clothes with a badge at his waist and the other in uniform, they ought to have been visible as police officers to the defendant, who was standing at and inside his door, by virtue of the cone of light emanating from the single

14

light bulb.  Smith was plainly in view as he reached the porch only a few feet from the defendant.  Though the light was dim on the perimeter of the cone where Roop was standing, Roop, who could see the defendant, ought also to him to have been visible to the defendant.

Summarizing the views of the psychologists, Dr. Saar found that the defendant did not know the nature and quality of the acts with which he is charged and did not know the wrongfulness of them.  Dr. Krieg, however, found that the defendant's illness did not render him unable to understand the rightfulness or wrongfulness of his behavior, but that it did affect his ability to reason rationally which Dr. Krieg in his testimony states as establishing his insanity at the time of the offense.  Dr. Clayman concludes that, because of questions remaining about his actual mental state at the time of the crime, no definitive statement can be made with respect to his ability to distinguish right from wrong; nevertheless, Dr. Clayman concludes that "there is little doubt that he had the capacity to conform his actions in accordance with the law, if he had so chosen."

15

After due consideration of the views of the psychologists and the facts found by the court, the court finds and concludes that the mental disease or defect of his condition -- properly diagnosed as Personality Disorder NOS with paranoid, narcissistic and anti-social factors -- was not so severe as to render him unable to appreciate the nature and quality or the wrongfulness of his act of possessing a firearm as a convicted felon or his act of maliciously wounding Officer Smith at the time of the commission of those acts.

The Clerk is directed to forward copies of this written opinion and order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

DATED: October 20, 2014

John T. Copenhaver, Jr.
United States District Judge

16